I will call the calendar and will counsel indicate your presence. National Resources Defense Council versus EPA. Good morning. United States versus Jackson. Good morning. United States versus Saunders. Best versus Babarata is on submission. Okay. We'll hear the first case. Thank you. Good morning, Your Honors. Pete Huffman for the Plaintiffs' Appellants. May it please the Court. This Court should reverse. There's no evidence in the record that the latest incremental updates to the Omega Computer Program contain any frank discussion of policy matters that is the hallmark of privileged deliberative records. This computer program does not make policy recommendations, it doesn't involve subjective value judgments, and it does not cull and select policy-relevant facts. The program is just a specialized calculator. It relies on the user to supply all the relevant input data, including data about hypothetical emission standards. As I understand it, there is a competing model that was used in creating the regulations that EPA issued that emanated from the Department of Transportation, is that right? That's right, Your Honor. You generally refer to it as the CAFE model. Now, suppose someone wrote a literal memorandum that said, I think we should use the Omega model rather than the CAFE model, because the Omega model does this, this, and this, which the CAFE model does not, and therefore it will give us a better picture of what we're trying to project and what policy decisions, in order to help us with our policy decisions. Would that be within the deliberative process privilege? That would be much closer, Your Honor. It would depend exactly, you know, what the sort of recommendations and how it tied to the policy and how it was used in the process. I understand. What would it — how it relates to the policy? The memo says, this is a better model than that one, because it takes account of this factor and that factor, and it more appropriately balances the calculation, right, than the other one. Why does it have to be deliberative? It can't be about a step in the process? It has to be about the final decision to be made? It could be about a step in the process, but it's got to be a policy-relevant step. And I think — Well, isn't it a policy-relevant step if someone — if this — so let me try to modify my hypothetical slightly. The memo says the CAFE model understates certain factors and will lead to a high estimate of the costs of a given regulation. And therefore, it's not a good model, and the OMEGA model will give a more accurate picture of the costs. That's not a — and then somebody else could write a memo, I assume, back saying, no, the other one's better, and then somebody has to make a decision as to what to use. Why aren't those kinds of memos just obvious examples of the deliberative process privilege? I think a memo like that could be, Your Honor. I think the key there, as you described in the hypothetical, is they're talking about accuracy. If they're talking about sort of technical measurement or the best way to make a calculation more accurate, that's not likely to cross the line into sort of a subjective — Why not? When you get this model, aren't you folks going to go and run the OMEGA model and come back and say, see, the administration has systematically overestimated costs by using a policy-biased model that is designed to produce results that will lead where they want to go? I mean, that's really what's at stake here, isn't it, in terms of the substance, not the FOIA issue? But that's really what the public wants to know about, isn't it? Yes, Your Honor. The public wants to know the most accurate calculation of costs, and we want to get the model and run that and put that in the public domain. This is a massive public health rule, and we think the public deserves transparency here. But we're not asking for any of those memos that you described. We don't know if it needs to be — But don't the models embody those assumptions? In other words, if — I mean, I'm not a computer person, right? I'm a literature person. I like words. If someone wanted to explain to me, we're going to use this model, and here's why, they would have to do it in words in a memo. But I'd rather imagine — maybe I'm wrong, and you can help me out if you think I'm wrong about this — that somebody who's sufficiently sophisticated, who looks at the code, will be able to say, oh, I see what's going on here. I see what these folks want to measure. And then they look at the other code, and they say, aha, these folks want to do the calculation this way. And that person may not need a memo. The program itself embodies the assumptions that underlie it. No? Well, Inspector General, I think you might be wrong, but you've hit on a very important point. First, a quick record point. There's no record evidence that there's been a substantive change here that could be revealed. We don't dispute that an expert, given enough time, could compare this to the 2016 release and at least tell what changes have been made. On the record, we're looking at the equivalent of typos, as you describe it. The trick there is that the expert would only be able to tell what the change in the algorithm was, not why, not who made it, and not what process led to it or how, if at all, it was used. And that's the sort of thing, comparing two memos or something like that is different in kind than comparing two versions of an algorithm. The memo lays out the reasoning, like you described, the why. And it's there in words that everyone understands. Now, I mean, a computer expert might be able to make an educated guess, but it's no more than that. It's too far removed from any of the actual policy discussion that might be going on in the background to be able to tell that. And I should stress again that there's just no record evidence that there's been any change, these incremental changes, put anything new of substance from the model. But there's nothing new in substance. Why can't you use the old model to do whatever you want to do? Because we tried, Your Honor. That's the first thing we did when we got all the inputs and preprocessors. It's just, it can be as small as minor debugging. If you get a new version of your word processor or something like that, the file just doesn't open. We don't know why. Your, your, your, your, your, part of your argument is that, um, the, the inputs are already known. Yes, Your Honor. Those are all public now. And so, um, the ingredients of policy choice are already known. That's correct, Your Honor. And so, and so how, so, so the core model, right, you're saying is simply a specialized calculator. Yes, Your Honor. You're saying it's part of a specialized calculator. Is that, that's, that's your argument? That's correct, Your Honor. What the core model's... Go ahead. So what the core model's going to do is optimize that input data. And, and the way you use this usefully for modeling is that, is that you modify the inputs. If you want to see the effect of fuel price, you, you change the fuel price input. The, the, the core model always runs the same calculations. You run the same inputs twice, you're going to get the same results every time. And so all we need is that we're missing that one key component to turn these inputs into the calculated costs. How do we, how do we, uh, how do we determine what is simply a specialized calculator or a technical calculator versus, uh, a calculator that is, uh, making policy judgments, complex policy judgments? How do we, how do we figure that out? So, Your Honor, we, we put in our, our declarations, I would direct you to the Declaration of Diplomacy 79, also in our brief. And EPA just hasn't disputed our description of this model. And we know it because there's copious documentation from, from previous versions of the model that, that, that this is what the model does. It does these brute force calculations. Computers are very good at that. It can take massive combinations and, and do something that would take a, you know, a human, uh, years and years, uh, to operate. And so I think if the court's looking for, for a principle, um, the, the, the cases are kind of all over the map when, when you get away from, you know, the memos that Judge Katzman put out. But, but the sort of common themes there are, are where you have a, a mass of facts and somebody has to exercise policy discretion to go in and select the relevant facts. And as you noted, Judge Katzman, uh, this, this happens, if at all, on the input side. Uh, you know, we don't, most of that we don't think particularly involves much policy judgment because you know the regulated entities, you know the relevant technologies. You just said much policy judgment. But if it involves any policy judgment, are you saying it involves some policy judgment or just not much policy judgment? Now much at all, and to be clear, this is all on the inputs. The inputs side. Already public. And, and to be clear, I mean, Teague talks about this. You, you're talking about not something that's sort of peripheral to the policy formation or anything that lightly touches on it. You, you, you're talking about the exercise of, of policy-oriented judgment. The sort of core decisions, uh, that the government needs to make and should be able to get frank advice, you know, from subordinates to the decision maker. If, if we agree with your contention that the EPA could not reasonably have foreseen that disclosure would harm any protected interest, we don't have to get into the mine field that you were just treading through. Isn't that right? It's absolutely right, Judge Kaplan. These are all independent bases to reverse. The Court determines that, and should determine that there's no record evidence that, that this version is, is substantively different from the one in 2016. So a plausible way that harms EPA's ability to candidly deliberate, that's sufficient to reverse an order. Even if it is substantively different, um, these things have been released for over a decade, right? Yes, Your Honor. And there is no hard evidence whatsoever that there was ever any chilling effect, uh, on frank discussion about these matters. Um, and there's, um, just no indication that public disclosure ever caused harm. Isn't it just a case of somebody wants to hide the ball here? We absolutely think so, Your Honor. And it's not just that there's no evidence of harm, right? There's evidence in the record that these releases improved the model. We know from, uh, then-Director Oge, who was present at the creation and oversaw the first four releases, that staff expected these would be released, that, that staff knew that these are going to be out there, there were peer reviews. And it's not just her testimony. There's a long record here. EPA staff publishes papers that discuss the modeling. They give presentations. There's just a wealth of evidence, um, that these releases improved the accuracy of the model through feedback, and there's no record evidence that any of these releases caused harm to EPA's ability to candidly deliberate. I mean, there's nothing in this record on either the issue of harm to the deliberative process, that is, to the agency, or to the public, except these two statements by Mr. Wareham, in which he says he believes there's harm. He believes there were going to be attacks on four embassies, or whatever. He believes the earth is flat. He believes we may fall off the earth if this gets disclosed. Is that enough, any of this? Absolutely not, Your Honor. And you're correct. It's only there at JA 125, those two paragraphs of Mr. Wareham. When he says he believes, it's just reciting, it's boilerplate. It's what the deliberative process is supposed to do. You could swap out Omega Computer Program and put in any other record. And if that's sufficient to justify withholding, Congress's reasonably foreseeable harm amendment becomes a dead letter. They're clearly trying to do that. This is what interests me, is what can that amendment mean? Suppose we were dealing with the attorney-client privilege instead, and there was a document that came squarely within attorney-client privilege by anybody's definition. Would the agency then have to disclose the document under FOIA, nevertheless, unless it could show in some concrete way that this particular disclosure of an attorney-client conversation is going to cause particularized harm, as distinct from the reason we have the privilege, is because we expect that any disclosure of that kind of communication will cause harm. I see my time is up for my answer. Please. So, the attorney-client is not before the court, but- Well, but it's the same rule, right? I mean, the rule is what is privileged in discovery would not have to be disclosed in response to a FOIA request. And we happen to be dealing with one particular privilege. But the exemption and the amendment both apply to the entire exemption, right? They do, Your Honor. And I guess for the attorney-client, and they would have to make the additional showing of reasonable harm. It doesn't have to be a certainty, but it has to be objectively reasonable. I think the one way to look at there, we cited in there, the Department of Justice did that. I guess what I'm interested in is how does that differ from the general assessment of whether it's a true example of deliberative process privilege or not. Because the things we're looking at to decide whether it's privileged, whether it really is a policy deliberation and so on, if we were to decide that it is, then the reason we have the privilege is because there is a general understanding in the law that the disclosure of something that falls within that category is going to be harmful. Now, I understand the argument that the amendment must add something, but I'm just trying to figure out, like, what? What is the additional thing beyond this is a true example of what the privilege exists to protect? But nevertheless, we don't have any evidence that it's actually going to cause any real harm, so the privilege disappears. Well, Your Honor, I think for the sort of the core things you're talking about, you know, a current OLC memo to the president on the border wall or something like that, the additional factual showing is going to be very straightforward. You're looking for the things like the content and character and the age. If it's attorney-client advice, but it's stale and it's talking about something mundane, you know, building maintenance or something like that. But the point is this does drive a certain wedge. It means that documents that the agency would be privileged not to produce in an actual lawsuit must be disclosed under FOIA, right? Because there's a gap there now. Yes, that's correct, Your Honor. And so your point really is that the determination of whether something is binary or not in the context of this amendment need not be binary. That is to say you could have various kinds of documents along a long spectrum running from 1% deliberative, 99% fact to 99% the other way. And you have to look at where on the spectrum it falls in applying the amendment. I think you have to balance. Yes, Your Honor. And so your position has given the history, even if we were to conclude that in some remote sense, this might be characterized as deliberate, it's a stretch. And if it's that much of a stretch, the amendment comes into play. Absolutely, Your Honor. It is a stretch and EPA has a long record in history against them here. Before you sit down, let me just talk about for a minute, your argument about letters and memoranda, I understand your argument to be that computer programs are not letters or memoranda within the meaning of exemption five, but wouldn't your argument, isn't it a bit extreme? I mean, a computer programs, right, can have with embedded within them communicative messages that are kind of like letters or memoranda, correct? They might, Your Honor. Our argument is that this computer program doesn't fall there. The Supreme Court's been very clear in recent cases that the court's job is to apply the ordinary meaning of these exceptions as enacted. And EPA doesn't offer any ordinary meaning of memorandums or letters that would cover this computer program. And so we want the court to just read it out of the statute. The court doesn't have to go very far out on a limb here to say that this computer program, whatever the outer reaches of memorandums or letters, it doesn't reach far enough to encompass this computer program.  Thank you. You'll have three minutes. Thank you, Your Honor. Your Honor, may it please the court, Samuel Dollinger from the U.S. Attorney's Office for the Southern District of New York for EPA. Just to begin where we left off, Judge Kasman, with your question, this would be a fundamental shift in the way that exemption five is applied. The Supreme Court has consistently held for decades that this was the way that Congress meant to incorporate all the normal civil discovery privileges. And the two circuits that have considered the argument have rejected it out of hand. But this Court's cases and the cases in the D.C. Circuit suggest the same result. We have records in Lead Industries Association that included things like tables and graphical materials that summarize data. It's hard to see how a computer program, which is ultimately a complex set of instructions for doing something, is materially different from those things. Can I ask you on the foreseeable harm standard, which was added to the FOIA Act of 2016, can you cite to me any cases that hold that the foreseeable harm standard does not impose a heightened requirement? Your Honor, I don't know if I have a case that holds that there is, that there is a no heightened requirement, but that, I guess, if I can clarify, what the government's position is, is that the purpose of this amendment was, as some of the legislative history reflects, to codify an executive policy that had been in place under a Holder memo, but the policy actually originated from an Attorney General Reno memo, was rescinded through a memo under then Attorney General John Ashcroft, and then was restored by that Holder memo. And so there's some discussion in a Senate report, this is Senate Report 114-4, which is cited in Plaintiff's Brief, that the purpose of the exemption was to codify that, I'm sorry, of the amendment, was to codify this policy and not have it be subject to future executive changes. The, so, again, under this amendment, the agency is required to conduct its own analysis of whether harm would result, and to Judge Lynch's point, this is the purpose for which many of these privileges exist, is that it's considered core to our legal system that certain types of deliberative documents, attorney-client-privileged documents, would harm, would harm the functioning of our system, would chill the candid advice that decision-makers need to have, were they subject to. I understand that, and that, I think we all understand, but with respect to the 2016 Act, wasn't part of what was motivating the 2016 Act, was that too often there was an effort to block public disclosure? Congress did. I mean, that was when you read virtually all the legislative comments and the floor managers and the statements. That's the thrust. Some of the legislative history does address a concern about the application of Exemption 5. In the House report, however, the House report makes clear that the main way that the House is going to deal with this is through the accountability of the deliberative process privilege, which is now part of Exemption 5's text, and that, you know, in this discussion, the House report doesn't do that. The problem with that argument is that the statutory language is at war with it. The statutory language is that the agency reasonably foresees that disclosure would harm the relevant interests. Now, that clearly speaks to judicial review of the reasonableness of the agency's foresight. And that means that we have to make a judgment about whether it makes sense. And to have somebody from the agency come in and say, I believe the earth is flat, does not make that a reasonable proposition that we can't look behind. Respectfully, the purpose of the amendment was to ensure that the agency continued to conduct its own harm analysis, as had been required by executive policy in some, but not all, of the recent past. And the reason for this is the reason for this is Well, Your Honor, there is a specific analysis that runs to this question, but the Court must keep in mind this is necessarily a predictive judgment. And the real harm that we're looking at here should not be assessed on a record-by-record basis, because to judge Lynch's This is what I was trying to figure out with your adversary, and I'm not sure now what the government's position is on the question that I asked him. Do you deny that there is space between what the privilege entails and what the FOIA exemption entails? No, Your Honor. We think that there is a There is some kind of heightened There will be some documents that would come within a privilege and do not have to be disclosed in litigation in discovery, but that would be accessible through FOIA. Is that correct or incorrect? Correct, Your Honor, because the agency can make the determination Now this gets to the next question. Is what you're saying, then, that what the amendment accomplishes or does is direct the agency to make a certain kind of analysis before you invoke the privilege in a FOIA case? That is correct, Your Honor. And then would you – are you saying further that that analysis is unreviewable, that if the agency says, we thought about it and we think this would be harmful and therefore we decided to invoke the privilege, that that is the end of it and now we're back as if we were just – the only question that's left for us to review is whether the privilege applies by its terms? Well, Your Honor, the court reviews whether the agency has in fact conducted this harm analysis. And where do we find anything in the record that says that they have at all, first of all, before we get to the question of whether we get to evaluate the quality of that? That is at page 125 of the Joint Appendix, which is the Wareham Declaration in which the agency's declarant stated that he foresaw harm. That's the I believe statement? Correct, Your Honor. So that's the first thing. That's what there is that shows that the agency has conducted an analysis of whether harm is going to take place because the responsible actor in the agency tells us that this is his conclusion without telling us how he reached it or whether there was any process or what thought was given to it? No, Your Honor. There is in the declaration some specific analysis of these specific records. We're at the summary judgment stage, right? And you've got Margo Oga, if I'm pronouncing that correctly, casting very significant doubts on these declarations to which you will cite. And the district court dismissed Oga's declarations because, and I'm quoting, it is possible that EPA policy change regarding the development of Omega has changed since Oga left the EPA or that Oga was not personally involved in making substantive changes to Omega while other EPA employees were. But even if it's correct that it is possible, and that's the quote, that EPA policy changed, why isn't the mere possibility of a possibility suggest justify a grant of summary judgment in favor of EPA? If it's also possible that the policy has not changed, then why doesn't that suggest that we should at least remand for further discovery? This being at the summary judgment stage. Your Honor, these two declarations address different time periods. The Oga declaration addresses the period from 2012 and before when she was an employee of the agency. But beyond that, if you do look to the Oga declaration, this is at page 78. In a way, that's the point. The point is that maybe we don't know enough. And summary judgment generally is inappropriate if there are genuine issues of fact. Your Honor, respectfully, the question of whether a harm is foreseeable, again, it's a predictive judgment that doesn't necessarily give rise to the kind of traditional fact findings, particularly in this area of deliberative process, attorney-client privilege, where the harm is operating in a fishbowl, as Congress said when it first put this language in place. The harm is not that one specific document may be disclosed and another may not. It's that if the atmosphere is one such that all of one's recommendations and pre-decisional product is subject to release at any time. Well, but what do you say to Judge Kaplan's question earlier that there's a long record of releasing these reiterations or iterations of the Omega model and its core calculating functions, and no evidence that the heavens fell or even that a cloud appeared in them? So, and I understand that there is some debate about whether or not the Omega model has a distinction in terms of, well, those were used in actual regulation and so on. But I don't see where that goes to the question of harm. That may go to whether it's deliberative or pre-decisional or something. But I don't see how the fact that the model in those instances was used affirmatively to give the basis for regulation affects the question of is it harmful to disclose to the public how this program works. Well, Your Honor, let's, those prior releases were all in conjunction with EPA's formal release of a proposed regulation, a final rule, in some instances a technical document that stated we are relying on this specific version of Omega for this formal EPA action. And so that's what distinguishes it from... It's now part of the decision rather than pre-decisional. It's formally relied on by EPA in each of those determinations. And that means that EPA has decided that the results it's getting from the model are those that it considers the ones to rely on. You know, let's compare this, for instance, to something else iterative, like an agency policy that is revised and released to the public five times. In between each of those releases, when an agency staffer starts to tinker with the regulation and consider a proposed change to it, each of those interim versions is deliberative because it reflects this process, the consultative process, the back and forth, and the fact that ultimately the whole purpose of this is to create something that the agency will ultimately rely on and release just doesn't speak to the question of whether the release of interim versions would cause that change. Let me approach this question in perhaps a different way. You would agree with me, I take it, that evidence in support of and in opposition to motions for summary judgment must be of a sort that would be admissible at trial. Yes? That is generally true, Your Honor. There are some caveats in the FOIA context, but... Mr. Wareham's statements of his belief, how is that admissible at trial? Well, Your Honor, I think I started to get here before. These are predictions about the future, and a future in which what we are concerned about is the erosion of the agency's ability to deliberate in confidence. Another way of saying it is that at best, at best, he's offering his opinion about the future on an assumed hypothetical state of facts, i.e., release. Yes? Your Honor, this is necessarily something that cannot be proven through specific evidence. It's... A doctor's opinion that a person who has biopsied and has a certain kind of histology in a mass is likely terminally ill with cancer is also forward-looking, right? Correct, Your Honor. And we let appropriately qualified doctors give that opinion on a motion for summary judgment or at trial if they are, A, qualified as experts, B, have applied some reasonable and systematic methodology in a reliable manner and based the opinion on facts which experts in the field would rely upon. That's a fair approximation, right? Your Honor, respectfully, this type of determination is not one that... In many ways, the agency is the best-placed expert to opine on the release of which documents would foreseeably cause harm. Would that extend to somebody in the mailroom? No, Your Honor. We're talking about agency decision-makers, agency staff who work on the relevant issues, of course. Here we have the... So if the other side could produce affidavits from people in the agency now or in the recent past who had different opinions, that would suffice to raise an issue of fact, would it not? Well, Your Honor, if I can point you to JA-78, this is the Ogi Declaration. The Ogi Declaration is also reduced to statements like, I do not believe the release of the latest full version of Omega would harm the agency's decision-making process. Fine. So there's no evidence either way. So, but I think, Your Honor, it's not because there is no evidence either way, but because of the nature of this judgment. I mean, it's... Why isn't there evidence both ways? I mean, I'm inclined to agree with you that this is not the sort of thing that's quite as susceptible to diagnostic tests as the medical expert example, but there are competing expert opinions here to the extent we're talking about expert opinions. Your Honor, there are opinions of two declarants who covered different time periods at the agency, and for that reason alone, we don't believe that there is any... That's a reason to believe the one who is right there now on the scene over the other one, but isn't that the sort of thing that a fact-finder typically would take into account? The decision-maker who is there now and overseeing this particular development of the Omega model, and in FOIA, there's a well-recognized presumption of correctness to agency declarations unless there is specific controverting fact, which we don't have here. Well, you know, I imagine your adversary might even be inclined to concede that because, I mean, people believe all kinds of things. Your Honor, this is yet another reason that, in our view, the purpose of this amendment to FOIA was not to lead to this, to the type of judicial second-guessing of these kinds of agency-predictive judgments. Well, why wasn't the amendment framed in terms that would say that the agency not reasonably foresees that disclosure would harm, but that the agency has concluded that disclosure would harm? That would be a way to put it in the agency's bailiwick much more clearly, right? Your Honor, let me just get the text in front of me. The text of FOIA now states under 552A8, this is at 39 to 40 of the red brief, an agency shall withhold information under FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption. So that is, in fact, the way that Congress framed it was. And so why reasonably? Doesn't reasonably suggest an objective standard? Your Honor, that's the point. I mean, presumably when they certify it, they believe that they believe it reasonably. But generally speaking, when we put into the law something that says, you know, someone has a defense, if they reasonably believe their life was in danger, there's an outside force in the court, the jury in that case, that decides whether the belief was reasonable. Your Honor, I think this goes back to what you were making earlier, which is that the elements of the deliberative process privilege itself, they incorporate this idea of the harm that would be caused to agency decisionmaking if it meets the elements of being a pre-decisional and deliberative document. But that's, yes, exactly what puzzled me. It's not a point I was making. It's a puzzlement I have and a question I'm asking of both sides is where is the space between the two? And you've conceded there is space between the two, that there are going to be cases where the elements of the privilege exist, but still this reasonable foreseeability amendment makes a difference. And to put Judge Kaplan's question in a slightly different way, we have lots of statutes that say things like the Attorney General has to personally certify that she has made certain decisions. It's not going to be left up to some AUSA somewhere, with all respect. I was one. I respect that office. But sometimes Congress wants the person at the top to make a decision. And once they certify that they've made that decision, the statute doesn't say, and then a court gets to second-guess whether it's reasonable. The point is this has been made at a high level and that's good enough for us. But this doesn't say that. This doesn't — you're suggesting, it seems to me, that what Congress really wanted to do, which is a little hard to get from this language, was to say something like that, that we're trying to reinstitute the Holder memo and say when a decision like this has to be made, somebody high up in the agency has to make a determination that there's a really good reason to invoke the privilege, that it will cause reasonable harm, and certify that to the court. But that isn't what they said. Your Honor, I believe that the language is best read that way just because, again, the clear purpose of what Congress was doing here was to ensure that there would not be further changes to executive policy in terms of the agency's own self-analysis of harm. And to go back to the — But, you know, that's debatable. I mean, if you do go look at the Senate and House committee reports, the language is very, very strong. You've got the Senate report citing a growing and troubling trend towards relying on these discretionary exemptions to withhold large swathes of government information, even though no harm would result from disclosure. You've got the House committee report. The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse. The deliberative process privilege has become the legal vehicle by which agencies continue to withhold information about government operations. And when you tie that language to the language in the statute, which, as Judge Kaplan points out, is — does not talk about the agency's responsibilities, doesn't put it within the bailiwick of the agency, this is a judicial function, arguably. Your Honor, I understand the view, but — I'm not saying it's my view. I'm just putting it to you. On its face, the language here does bespeak an agency function, at least in the first instance, as it's drafted. One that has to be reasonable. Correct, Your Honor. We just presume that whatever they say is reasonable, so they might as well have left that word out and just said if the agency concludes, if we're supposed to just take their conclusion as evidence that it must be reasonable because they say so. Well, Your Honor, the — ultimately, it would not, for instance, be reasonable if the conclusion were to be, I believe the world is flat, but, you know, my belief — you know, it was recommended to me that the world is flat, and therefore — I'm sorry, I don't think I'm getting my point across here. I hear what you're saying. That there would be certain — There must be some facial — There would be certain things that would be facially unreasonable that would be excluded, but only that. That it falls within one of these privileges. And, you know, in the context of something like the attorney-client privilege, the work-product privilege, it may be difficult to enunciate exactly why release of a specific attorney-client communication, you know, in a void would be harmful, you know, to this case, to our legal profession as a whole, but we erect a fairly — because we do consider it to be essential for the functioning of the legal profession. If I may ask one more question, which goes back to the earlier issue, Mr. Huffman said that this model is basically just a fancy calculator. All it does is literally crunch numbers. It's about adding, subtracting, but because it's for a computer, because there are millions of these addings and subtractings that have to happen, and so hence a computer program. And it doesn't embody any policy judgments or policy analysis or policy assumptions that could be controversial or that would give rise to issues involving deliberation. What is the nutshell of what your response to that is? So especially in these functions like cost estimation, there's quarrels with the Department of Navy. This is a D.C. Circuit case concerning cost estimates for some new home ports for Navy battleship groups. Those cost estimates were withheld as deliberative because the court recognized that even what seemed to be ministerial decisions, something with the surface precision of numbers, as the court framed it, often do involve significant decision making in terms of what variables to consider, how to weight them. And without disclosing anything about this iteration, looking back at the earlier models that have been released, could you give me an example of some aspect of the algorithms in one of those programs that meets this description? Well, what I can cite you to are some of the, in proposing the new safe vehicles rule, EPA explained in part its decision making about why it changed models from Omega to CAFE. And among the things that stakeholders had said about Omega was that it incorporated inaccurate assumptions about whether vehicle manufacturers were going to completely redesign their fleets every four years, whether it considered certain shared parts like engine systems, transmissions, and engineering platforms. I mean, these are technical things, but how one characterizes each of these factual, there is a factual nub to it somewhere, but how to incorporate that into the analysis is deliberative. Looking back at previous core models that were, which have been, which are public, looking at those previous core models, can you give me examples which would suggest that the, that the release of the core model revealed policy decisions? Well, Judge Katzmann, I think in part because of the function of the core model. Because if you can't, if you can't, then your argument about the effect of release of the core model evaporates.  Can you look at the previous core models and give me examples? I'm sorry, Your Honor, examples of changes between past versions of the core model? Yes, that suggests policy deliberative choice. Your Honor, it's our view that these types of considerations about how best to optimize, which variables to look at, always do have deliberative content before they become the agency's final decision. And if I can also just point you to Wolf. I'm asking your help in helping me understand, specifically looking at the past, not what's in the current model, but looking at the past. I think that the main thing I can point you to, standing here today, is that there was a consideration at a point that EPA disclosed, that it considered what it called a consumer choice submodel. Apart from that one. Your Honor, I think that's unfortunately the best example I can give you, which is — Well, but you also came up with one to me, didn't you, a minute ago, that said something like there was criticism that the Omega model assumed that the automakers would redesign their fleets every four years. Yes, Your Honor. That is — I can give you a — that's 83 Federal Register 43023. But the fact that that model made that assumption in the past, for good or ill, was public, right? In the past versions of the model? That's what we're talking about. Correct, Your Honor. Okay. And is there anything in the record that suggests that the fact that that was made public in the past caused any harm whatsoever? Your Honor, the question is not whether a past release of a finalized agency product after it has been — has gone through the agency's vetting by high-level decision-makers in the past caused harm. Because the — what we are focused on is whether the fact of agency deliberation beyond, you know — Is what you're saying that we don't know whether, with respect to one of those past models that was released, six months earlier an analyst at the agency had suggested excluding this from the — this assumption about every four years from the model and prepared a different version of the Omega model that left that out? And you're saying if that had been — the whole point is we get to find out what the agency is relying on, and we as the public, and decide whether we think what they did was reasonable, but we don't get access to all of the internal struggles where somebody said, although ultimately the agency decided to the contrary, no, that's stupid, don't do that. Yes, Your Honor. That's exactly what we're arguing, is that these — that agency staffers need to have the freedom to propose things that later get — are rejected by their superiors, and that what is final for deliberative purposes is whatever becomes the agency's final position on review of its formal decision-making by the agency itself, rather than, you know, whether we're releasing sort of these interstitial proposals by people at the staff level. But adopting that point of view effectively reads the words reasonably foresees out of the statute, right? Your Honor, again, I think that the question of reasonable foreseeability goes to whether the agency would consider it to be harmful to its process of modifying this analysis. Any time they invoke the Exemption 5, they do, and therefore it renders the amendment a nullity. Your Honor, the amendment requires the agency to consider for itself whether this would be harmful to its process. And otherwise, you know, the agency doesn't — isn't required by FOIA to sort of livestream its process of modifying its policies. And so this is, you know, on the technical end of what the agency considers in terms of making policy determinations. But, you know, what we're being asked here ultimately is whether each of these interstitial steps along the way to coming up with agency policy can be released without, you know, in the aggregate, that harming the ability of the agency to function as a decision-maker. Thank you. Thank you, Your Honor. Your Honors, I'd like to go back to the consumer choice hypothetical here. Everything EPA is saying they never do in Mr. Wareham's declaration, they did with the consumer choice model. They're hypothetical. They sent it to an outside lab to develop and told the public they'd done that. And then they released the documentation. They'd never done that before. Then EPA staff did a validation exercise and published a draft report of that and said this did not do well. And then EPA released the model code in 2016 along with the Omega model, even though it didn't rely on it in any final agency process. The one hypothetical that EPA was able to come up with rebuts all of their general claims. And I would say on the — That was — am I correct that this is the answer to a question I was about to ask, which is can you give me an example where the agency released a version of a computer program or model that it hadn't used or that it decided to discard somewhere in the  Yes, Your Honor. You're saying this is exactly that. Consumer choice is a prime example and one that is apparently unaware of and is affidavit. I would say on the remand point, EPA had a full opportunity to rebut below. They got to brief last. And they had the opportunity. Mr. Charmley, their other affidavit, he's a staff member. He could have rebutted specific testimony from Director Oge if there was a basis to do so. EPA didn't for whatever reason. And they have to stand on that. Well, they have to stand on that for purposes of was the district court correct to grant summary judgment, right? Are you suggesting that we should say that you were entitled to summary judgment? Yes, Your Honor. And because your person saying, I believe, was only refuted by someone on the other side saying, I believe, and therefore you win? No, Your Honor. To be clear, Director Oge does not just say she believes. She has those statements and they should be accorded the same way as Mr. But with respect to harm. Yes, Your Honor. Director Oge provides specific testimony about the factual circumstances of each of those first four releases and what staff was empowered to do and what she had authorized staff to do. She says specifically she authorized staff to release and discuss the model at their discretion. She specifically says that staff were aware that the model could be released at any time. She specifically says that those releases were not done because it was final and approved. She says she never looked at and never approved these things for release, that they were released when the public was most likely to use them. There's no record evidence. And don't we have to draw inferences from that about what harm exists or don't exist? I mean, this all seems like, okay, she said that. That's really good information to have for a fact finder. That doesn't sound to me like that's irrefutable or that now there's no issue of fact about whether what's now being contemplated would cause harm. Your Honor, EPA has the entire burden here, right? The benefit of the doubt goes to the public. And if EPA doesn't make the factual showing, the record has to be released. Now, we think there's more than just Director Oge. There's EPA releases, the model documentation for each of these. Each of these said future updates will be released. Director Oge says this improved the model. We can see the model getting more accurate over time. There's the consumer choice model. There's EPA papers. There's EPA presentations. The only thing they have now is that Mr. Wareham says he believes it will be harmful now. Now, you said if that's enough, the reasonable foreseeable harm amendment might as well not be in the statute. Now, we sought execution — excuse me, we sought expedition here, Your Honors, because there's record evidence that Omega calculates data at odds with the data that EPA relies on to propose weakening existing standards. This is a massive public health rule, and we sought expedition because it's critical that the public have transparency here. FOIA doesn't just provide a right of access to the records. It provides a right of prompt access. But I think what Judge Lynch was getting at is this. You have cross motions for summary judgment, and it may well be that the Wareham affidavit does not get the EPA summary judgment. But once we turn to your motion for summary judgment, they're entitled to all reasonable inferences that could be drawn from anything in the record, and it's your burden to show there's no genuine issue of reasonable — with respect to whether the EPA reasonably foresaw that disclosure would harm the protected interest. Mr. McDermott, FOIA places a unique burden that's slightly different than typical summary judgment cases. It's because EPA is the only one with full access, you know, to the content of the record. So they have the entire burden to put forth a factual showing that justifies withholding. And I would point the Court to the Bloomberg case in 2010. The agencies owed no deference here, and all doubts are resolved in favor of disclosure. So if EPA can't make the factual showing — and the panel was asking for examples in these prior releases. You know, where's an example of a policy choice? And EPA can't point to one. So your position is different from the one I stated, which would apply on a summary judgment motion in another kind of case. Your position is that they're stuck with the showing they made for good or ill, and if they fail to make a sufficient showing in opposition to your motion, you win. Yes. Is that your position? Yes, Your Honor. And to be clear, EPA had the last bite of the apple below, and they didn't take it. We put all of this in. They got to brief last. And the only thing they put in was a declaration from Charmley about the machine code and decompiling. Charmley was in a position to rebut any of this testimony from OGA or anything in the record. These are not peripheral facts. These are core facts. But with respect to these questions, some of the things you mentioned in the OGA affidavit are specifically contested, right? She says nobody at a high level ever gave directives about how to run this model or create this model. And the EPA's affidavits say, yeah, but now we do. Your Honor, EPA just makes a sweeping statement, and she offers specific testimony about those. Now, it's true that EPA could have changed its policy, the possibility that Judge Kotsman alluded to, but EPA has the entire burden here to put forth that fact. Well, they say we make these decisions at a high level, right? Inspector, I would encourage you to read Mr. Wareham's declaration. I've read it. Thank you very much for the encouragement to do my job, but I've done it. So if you can point me to the specific language that I've misread or misconstrued, I'm happy to hear that. First of all, what Mr. Wareham says is that high-level policymakers may work with. He never says that he did. He never says that anyone else did at any time. He says may have, might or might not have, may decide, or whatever. Nowhere in there does Mr. Wareham say that he or anyone else ever actually did. Isn't that what's actually relevant? Whether somebody does or doesn't, the point I think what all this goes to is whether the decisions that are embodied in the model are high-level decisions. You could still have something that's deliberative that some underling writes a memo and it turns out everybody says, hey, that's a great memo. And then life goes on and for some other reason they do something else. The point is this is the kind of thing that embodies the kind of decisions that ultimately higher-level people would be inclined to make, right? No, certainly not from the entire. Nobody high up in the agency is ever going to say to some computer geek, hey, you have an assumption here that I don't like. Go back and redo it with a different assumption that strikes me as more in keeping with the way the world works. That kind of thing never happens, never should happen, never could happen in designing a computer model. Your Honor, it could happen, but there's no record evidence that it ever did. And that's really the point here. EPA has the entire burden, if that's relevant, to put forth record evidence that this kind of thing happened. And all of the record evidence, the specific record evidence, is that it never did. And all Mr. Wareham says is that they may, they may not, could have, might have. That's all he says. There's not a single example. And there are many counterexamples. Well, he can't give an example, can he? I mean, the whole point, if he gave an example and said, oh, here, we changed this code to this code, he's telling you exactly what he's trying not to tell you. Your Honor, he doesn't have to give the details about, you know, what exactly happened. But at a bare minimum has to say that it did make some substantive change and reviewed it, et cetera. Okay. Got it. Thank you, Your Honors. Thank you. Thank you both for your good arguments. The Court will reserve decision.